(131 P.3d 1248)

No. 93,698

SARAH BURGESS, *Appellee*, v. SHAMPOOCH PET INDUSTRIES, INC., *Appellant.*

—

Opinion filed April 7, 2006.

*Gerald N. Jeserich*, of Kansas City, for appellant.

*Robert G. Scott*, of Robert G. Scott, LLC, of Olathe, for appellee.

Before BUSER, P.J., MALONE and CAPLINGER, JJ.

BUSER, J.: Shampooch Pet Industries, Inc., (Shampooch) appeals the trial court's award of $1,308.89 in compensatory damages to Sarah Burgess for injuries to her 13-year-old Yorkshire terrier, Murphy. We affirm.

*Factual and Procedural Background*

On April 10, 2004, Burgess took Murphy to Shampooch in Kansas City, Kansas, for pet grooming services. Two days prior, on April 8, 2004, a veterinarian had examined Murphy and deter-

mined the dog was in good health. Moreover, Murphy appeared healthy when Burgess left her at Shampooch. Burgess returned later, retrieved the newly groomed Murphy, and paid the $30 bill.

Upon leaving Shampooch, Burgess noticed Murphy was acting strangely and was limping. Burgess immediately returned to the business and a representative of Shampooch denied any responsibility for Murphy's injury. The following day, Burgess sought treatment for Murphy at Veterinary Specialty and Emergency Center in Overland Park, Kansas. On April 13, 2004, 3 days after her ill-fated grooming, Murphy underwent surgery to repair a dislocated hip. Veterinary treatment also included x-rays, blood work-up, anesthesia, intravenous fluids, sutures, and pain medications. As a result, Burgess incurred veterinary bills totaling $1,308.89. According to the district court, Burgess testified at trial that Murphy "was back to her usual self within a short time after her treatment."

Burgess filed a Chapter 61 petition for damages in Wyandotte County District Court alleging negligence by Shampooch caused Murphy's dislocated hip. Following a trial to the court, judgment was entered for Burgess and against Shampooch in the amount of $1,308.89 plus court costs. Shampooch filed a timely appeal.

### The Measure of Damages Recoverable for Murphy's Injury

In its determination of damages the district court ruled that "a pet is different than a motor vehicle or a piece of machinery or other items of personal property in that a pet has no real market value." The district court relied on *Kansas Power & Light Co. v. Thatcher*, 14 Kan. App. 2d 613, Syl. ¶ 3, 797 P.2d 162 (1990), a case involving the destruction of a 35-year-old wooden utility pole, for the legal proposition: "When measuring damages to personal property where the item damaged has no market value, other relevant factors must be considered such as *cost of repair*, the original value, the loss of use, any special value to the owner, the loss of expected profits, and the cost of replacement." (Emphasis added.) With *Thatcher* as precedent, the trial court awarded Burgess the cost of Murphy's repair—$1,308.89 to reimburse Burgess for payment of Murphy's veterinary bills.

Shampooch appeals the district court's decision that a pet does not have a market value. To the contrary, Shampooch contends:

"People put dollar values-and therefor[e] market values-on their pets all the time. Sometimes it's just 'a good home'; sometimes it's a specific dollar value in a want ad; sometimes people actually have their pets put to sleep because they don't want to pay the vet bills for curing or fixing some existing damage or injury to the pet, thus putting a value on their pet at least less than vet bills. There are a number of ways to establish market values for pets."

Shampooch contends the damages awarded should be limited to Murphy's market value. This contention is predicated on the general rule that when repairs can restore personal property to its previous condition, the measure of damages is the fair and reasonable cost of repairs not to exceed the value of the property before damage. See PIK Civ. 3d 171.10. Shampooch asks this court to reverse the award of damages and remand the case to redetermine damages based on Murphy's market value. In the context of this request, it should be noted that at oral argument counsel for the parties stated that Murphy was originally purchased for $175. Shampooch further requests this court to conclude, as a matter of law, that there is a rebuttable presumption that a pet has a market value.

In response, Burgess tacitly acknowledges that Murphy may have value but observes:

"[W]hat is the value of a wet face licking received first thing in the morning? To a 'cat person' it is probably nothing but to a dog owner who has raised her friend from a puppy it is like the Master Card ad — priceless. What is the value of years of companionship, of training, of shared love? To put a value on a family pet all of this must be considered."

Burgess argues in support of the district court's damage award, however, because by

"allowing her the veterinary bills, the trial court put Burgess back into the position she was in prior to entering Shampooch Pet Grooming. She had a pet who could walk without pain, again. She did not have to find another pet, housebreak it, treat and care for it, feed it, walk it, love it and travel the many thousands of steps involved in a 13 year journey."

The determination of whether the district court applied the correct measure of damages is a question of law, and therefore, this

court's review is unlimited. *Werdann v. Mel Hambelton Ford, Inc.*, 32 Kan. App. 2d 118, 124, 79 P.3d 1081 (2003), *rev. denied* 277 Kan. 928 (2004) (citing *Board of Johnson County Comm'rs v. Grant*, 264 Kan. 58, 61, 954 P.2d 695 [1998]).

The question of the proper measure of damages recoverable for injury to a pet dog is one of first impression in Kansas.

There exists in the United States a prevailing view regarding the proper measure of damages in cases involving the injury to or death of pet dogs. As one legal commentator summarized the legal landscape:

"Companion animals have played a myriad of important roles in their human caregivers' lives since prehistoric times. More than inanimate objects, they provide companionship, affection, solace, and uncritical acceptance of their human guardians. The law, however, has valued them as commodities by restricting recovery for their destruction or injury to their fair market value. The fair market value of ordinary pets, unless they have special qualities as breeding or working animals, is usually close to zero and, as a result, plaintiffs whose pets are destroyed through another's negligent or intentional act are left with minimal damage recoveries." Livingston, *The Calculus of Animal Valuation: Crafting a Viable Remedy*, 82 Neb. L. Rev. 783, 847 (2004).

Another approach to evaluating damages in cases involving pet dogs is characterized as the "value to the owner" measure of damages:

"The Restatement and most jurisdictions take a position that in such cases it would be unjust to limit damages to the fair market value and, instead, use the so-called 'value to the owner' (also known as the 'actual value to the owner' or 'actual value') as the measure of damages. See Restatement (Second) of Torts § 911, Comment *e*, at 474 (1965). The Restatement notes that where the subject matter cannot be replaced, the measure of the 'value to the owner' is left largely to the discretion of the trier of fact. See Restatement (Second) of Torts § 912, Comment *c*, at 481 (1965)." *Anzalone v. Kragness*, 356 Ill. App. 3d 365, 370, 826 N.E.2d 472 (2005).

This approach is contemplated by the language in *Thatcher* which allows consideration of "any special value to the owner." *Thatcher*, 14 Kan. App. 2d 613, Syl. ¶ 3.

Several jurisdictions have found that where recovery is sought for a dog's injury, however, the owner is entitled to recover the reasonable veterinary expenses incurred in treating those injuries. See *Kaiser v. United States*, 761 F. Supp. 150 (D.D.C. 1991)

($1786.50 in veterinary fees awarded pursuant to the Federal Tort Claims Act for injury to dog shot by United States Capitol Police officer); *Kurash v. Layton,* 251 N.J. Super. 412, 598 A.2d 535 (1991) ($851 in veterinary fees awarded to owner whose dog sustained injuries when it was impregnated by defendant's trespassing dog); *Goldberg v. Ruckstuhl,* 408 So. 2d 374 (La. App. 1981) ($294.74 in veterinary fees awarded to owner due to treatment of serious wounds inflicted on a poodle); *Brown v. Swindell,* 198 So. 2d 432 (La. 1967) ($96 in veterinary fees awarded to owner for treatment of flesh wound and amputation of dog's leg); Annot., *Damages for Killing or Injuring Dog,* 61 A.L.R.5th 635 § 11(a).

Our review of Kansas case law did not identify any case analyzing the proper measure of damages to an injured pet dog. There is precedent, however, for employing a market value approach in measuring damages to an injured horse for hire. In *Monroe v. Lattin,* 25 Kan. *351 (1881), a jury awarded plaintiff $173 for damages incurred when the defendant negligently allowed plaintiff's horse to run away—damaging the horse, buggy, and harness. In addressing the proper measure of damages to the injured horse, Chief Justice Albert H. Horton wrote for a divided three-person Supreme Court:

"So, also, the difference in the value of the horse before and after reasonable treatment, with the expense of the treatment, and the value of the use during the treatment, all not to exceed the value of the animal, is a correct mode of measuring the damage for the injury to the horse." 25 Kan. at *356.

This precedent, however, is not especially helpful. First, unlike Lattin's damaged horse, Murphy, as a consequence of successful veterinary surgery, was restored to her former health. Assuming arguendo that Murphy had some market value prior to her hip dislocation, it was the same market value she had following her successful recovery from surgery. Second, we perceive a distinction between the purely economic value of a horse for hire and a pet dog, like Murphy. Whereas horses for hire are engaged in a business purpose conducive to economic valuations, the record reveals no such commercial relevance to Murphy. Finally, *Lattin's* rule which provides that the recovery of damages must not "exceed the

value of the animal" makes sense in the economic marketplace but is certainly problematic in the case of a pet dog whose value is typically noneconomic.

In evaluating the propriety of the district court's award of the cost of veterinary bills as damages in this case, we are mindful of the practical, common-sense approach traditionally employed by Kansas courts in determining the appropriate measure of damages:

"While Kansas decisions give the courts a great deal of latitude in arriving at the proper measure of damages depending on the facts present, it appears that all of the various approaches at computing damages have the same ultimate goal: to make the damaged party whole. . . . '[T]he sundry rules for measuring damages are subordinate to the ultimate aim of making good the injury done or loss suffered and hence "[t]he answer rests in good sense rather than in a mechanical application of a single formula. [Citations omitted.]" ' " *Thatcher*, 14 Kan. App. 2d at 617.

Consistent with this long-standing common-sense jurisprudence, we find the district court did not err in its award of damages to Burgess. We hold that when an injured pet dog with no discernable market value is restored to its previous health, the measure of damages may include, but is not limited to, the reasonable and customary cost of necessary veterinary care and treatment. Several factors compel this conclusion.

First, the district court properly found that, for purposes of determining the measure of damages, Murphy is personal property. Both our Supreme Court and legislature have previously treated dogs as personal property in a variety of contexts. K.S.A. 79-1301 (defining a dog as personal property for tax purposes); *State v. Rodriguez*, 269 Kan. 633, 638, 8 P.3d 712 (2000) (finding that a dog is personal property pursuant to criminal statutes); *State v. Fenske*, 144 Kan. 560, 61 P.2d 1368 (1936) (finding that a dog is personal property for purposes of larceny).

Second, we are persuaded that a Yorkshire terrier kept by its owner as a household pet for 13 years has no discernable market value.

" 'Market value means, generally, the price for which an article is bought and sold, and is ordinarily best established by sales in the ordinary course of business. In order for it to be said that a thing has a market value, it is necessary that there

shall be a market for such commodity—that is, a demand therefor and an ability from such demand to sell the same when a sale thereof is desired. . . .' [Citation omitted.]" *Airight Sales, Inc. v. Graves Truck Lines, Inc.*, 207 Kan. 753, 756, 486 P.2d 835 (1971).

In the instant case, unlike other types of personal property, there are no true marketplaces that routinely deal in the buying and selling of previously owned pet dogs. Moreover, Murphy's real value to Burgess as a household pet is noneconomic and, as a result, is difficult if not impossible to appraise in the purely economic terms of market value. Or, as one court observed, "it is impossible to reduce to monetary terms the bond between man and dog, a relationship which has been more eloquently memorialized in literature and depicted on the motion picture screen." *Zager v. Dimilia*, 138 Misc. 2d 448, 524 N.Y.S.2d 968 (1988).

Third, the district court's reliance on veterinary bills as a measure of damages in this case was especially appropriate because Shampooch did not dispute the necessity for or amount of Burgess' veterinary bills. As a result, the invoices for Murphy's veterinary care and treatment provided the district court with substantial competent evidence to find that the veterinary services were necessary to repair Murphy's dislocated hip and that the costs were reasonable and customary. The determination of the necessity for veterinary treatment and reasonableness of veterinary bills is also practical because it is readily ascertainable and provable. Indeed, in the context of human beings claiming damages for personal injuries, district courts and juries are routinely confronted with analogous damage determinations regarding "reasonable expenses of necessary medical care." PIK Civ. 3d 171.02. In short, the evidence relied upon by the district court in this case in awarding damages was uncontroverted, straightforward, and easily applicable to the facts of this case.

Moreover, the award of the amount Burgess spent on veterinary bills is in accord with the very purpose of the law of damages—to make Burgess whole and return her to the position she was in prior to Shampooch's tortious conduct. It can hardly be said that a lesser award—for example, Murphy's original purchase price of $175 depreciated over 13 years—would " 'make good the injury done,' "

14 Kan. App. 2d at 618, or fairly and adequately compensate Burgess for her out-of-pocket expenses.

Finally, Shampooch hyperbolically claims: "To allow this ruling to stand in its current state would open the proverbial 'floodgates' of high dollar litigation on behalf of animals with market value substantially less than the claims." We disagree. Our holding is premised upon the finding that Murphy's veterinary care and treatment were necessary and that the costs were reasonable and customary. We do not address those special cases wherein a pet dog may receive extraordinary veterinary care and treatment or may incur veterinary costs that are unusual or unreasonable.

Affirmed.